E-FILED
Tuesday, 22 September, 2015  11:15:00 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| ELAINE VIRDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   14-cv-1219 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R & O P I N I O N

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 15) and Defendant's Motion for Summary Affirmance. (Doc. 18). For the reasons explained below, Plaintiff's motion is granted in part and denied in part and Defendant's motion is denied. Because the ALJ erred in assessing Plaintiff's claim for benefits, her decision is vacated and the matter is remanded to the Commissioner for further proceedings consistent with this opinion.

### PROCEDURAL HISTORY

On January 14, 2008, Plaintiff Elaine Virden applied for disability insurance benefits and supplemental security income, claiming that she had become disabled as of June 13, 2007. (R. at 151).[1] The Social Security Administration initially denied Plaintiff's applications, and did so again on reconsideration. (*Id.*).  An ALJ then denied her claim in a September 23, 2010 decision (R. at 151-163), but the case was remanded by the Appeals Council on February 22, 2012. (R. at 169-71). On remand,

---

[1] Citation to R. at ___ refers to the page in the certified transcript of the entire record of proceedings provided by the Social Security Administration.

a different ALJ then denied Plaintiff's applications. (R. at 24-36). The Appeals Council denied Plaintiff's request for review on May 16, 2014, thereby making the ALJ's decision the final decision of the Commissioner of Social Security. (R. at 5-9). Plaintiff then filed her Complaint (Doc. 1) with this Court on June 4, 2014.

BACKGROUND

Plaintiff has a long history of working in jewelry stores, which began in 1991. She worked in sales, as a polisher, as an inventory manager, as an assistant manager, and as a timepiece manager. (R. at 350-51). After fifteen years of mostly consistent employment, Plaintiff took leave from her work pursuant to the Family Medical Leave Act in January 2006 for migraines. (R. at 343). Since then, she contends that she has continued to suffer from regular, severe headaches and seizures.

## I. Medical History

Plaintiff began seeing Dr. Brian O'Shaughnessy for treatment of headaches in February of 2006, before her alleged disability onset date. (R. at 526). Although she reported having always had headaches, she complained that they were both more frequent and severe at that time. (*Id.*). She had recently stopped working because of the headaches, which she described as "especially bad around the time of her menses." (*Id.*). The headaches were sometimes accompanied by light and noise sensitivity, nausea and vomiting, and vertigo and blurred vision. (R. at 526-27).

Dr. O'Shaughnessy did not find "significant abnormalities" during Plaintiff's neurological examination, and he suggested that she might suffer from migraine headaches. (R. at 528). He hypothesized that "her hormonal status or stress of extra

work around" the winter holidays could trigger her headaches. (*Id.*). He prescribed her Topamax (beginning with 25 mg at night and adjusting upward as necessary) for migraine prevention, and Maxalt to treat pain during a migraine. (*Id.*). At that time, he opined that Plaintiff could not return to work, because she was having three to four headaches per week. (*Id.*).

She returned to Dr. O'Shaughnessy a month later, and reported that she could not tolerate Topamax and was still having headaches. (R. at 525-26). He prescribed her nortiptyline to control the pain, and wrote her a letter keeping her off work because her headaches had not improved. (*Id.*). In April of 2006, Plaintiff reported that nortriptyline had been providing her with some relief, as she was having headaches one to two times per week rather than three to four times. (R. at 525). She used Maxalt once, and reported it worked. (*Id.*).  Dr. O'Shaughnessy released her to return to work, and continued her on both the nortiptyline and Maxalt. (*Id.*).

Plaintiff attempted to return to work in March of 2006, but quit in May 2006 because the migraines persisted. (R. at 343).  She attempted to resume work a second time, from September 2006 through November 2006, but quit again because repeated migraines still hampered her ability to work. (*Id.*).

Plaintiff did not see Dr. O'Shaughnessy again until April 4, 2007, one year later. (R. at 523). At that time, she was unemployed and did not have insurance. (R. at 524).  She told him that she had a seizure the previous Sunday. (R. at 523). Her husband heard her make a loud noise while she was sitting on a couch, and then saw her laying on her side with her arms in tonic-clonic activity for thirty seconds to

3

one minute.   She bit her tongue during the seizure. (*Id.*). Dr. O'Shaughnessy described the episode as "very suspicious" for a seizure, and suggested that it could be related to her history with viral meningitis. (R. at 524). He prescribed carbamazepine (a generic version of Depakote) and urged her to get either a CT scan or an MRI, but noted that Plaintiff was under significant financial limitations. (R. at 524-25). Finally, his notes also indicated that Plaintiff's headaches had continued since her previous appointment, and that she had weaned herself off of medication because it was not helping her. (R. at 523). At her follow-up visit, she was appropriately taking her seizure medication and had not had any other seizures. (R. at 522).

About half a year later, in January of 2008, Plaintiff returned following another seizure that occurred in December 2007. (R. at 521). Plaintiff had again attempted to return to work (*see* R. at 386), and said she had a generalized convulsion on her first day back. (R. at 521). At that time, she was not taking enough carbamazepine, as she was running out of medication and could not refill the prescription (*Id.*).   She did not have further seizures after refilling her prescription and taking the appropriate amount of carbamazepine, but she reported continuing headaches, dizziness, a decrease in memory, and difficulty concentrating. (*Id.*). Dr. O'Shaughnessy wrote that Plaintiff most "likely has tension headaches which are triggering migraine headaches," and prescribed nortriptyline for a second time. (*Id.*).

Plaintiff returned to Dr. O'Shaughnessy for a follow-up on April 21, 2008. (R. at 572-73).   At that time, she had stopped taking nortriptyline for her headaches

4

and had begun taking amitriptyline.   (R. at 572).  Following the change of prescription, she reported sleeping better and said that her headaches decreased although she continued having them every day. (R. at 572-73). Dr. O'Shaughnessy reviewed an MRI, which showed "two nonspecific white matter hyperintensities in the frontal regions," which is consistent with other patients who suffer from migraines. (R. at 573). He kept her on carbamazepine for partial complex seizures with secondary generalization. (*Id.*). Plaintiff was still seizure free at a June 2, 2008 follow-up visit, and reported that she was sleeping well and continuing to get headaches. (*Id.*). Most of her headaches were in the evening. (*Id.*).

Plaintiff reported a third seizure to Dr. O'Shaughnessy on July 2, 2008. (R. at 571-72). She has been doing yard work in late June, and went inside feeling sweaty and not well. She fell when she went to sit down, and she said she was confused throughout the day. (R. at 571-72). At this visit, Dr. O'Shaughnessy wrote a letter indicating that he believed Plaintiff was unable to work at that time.  (R. at 572).

Plaintiff last visited Dr. O'Shaughnessy on August 13, 2008. (R. at 571).  She reported having headaches twice a week, but said they had been less severe. (*Id.*). She told him that she had engaged in physical activity like mowing the lawn without a seizure. (*Id.*). But she said that she "feels a little bit mentally foggy" when she gets stressed out. (*Id.*).

Dr. Rakesh K. Garg treated Plaintiff from June of 2009 through January of 2010. (R. at 459-463). His June 12, 2009 treatment notes indicate that Plaintiff had not had a seizure since June of 2008. (R. at 459). She saw Dr. Garg complaining of a variety of difficulties with her memory, speech, tremors, and thinking. (*Id.*).  Her

exam was "completely normal," and Dr. Garg's notes reflect that he "can not explain her multiple complaints. . . ." (*Id.*). He predicted that "all her problems are related to underlying psychosocial situation." (*Id.*). In the month after her initial visit with Dr. Garg, Plaintiff had another seizure, which was witnessed by her husband. (R. at 460). Dr. Garg attributed this to under-medication, and adjusted the dosage of carbamazepine she was taking. (*Id.*). Her headaches persisted, and he told her she could take between 10 and 15 tablets of narcotic pain pills a month to treat the pain. (*Id.*).

On August 27, 2009, Dr. Garg described Plaintiff as "completely seizure free," but noted that she continued to have headaches. (R. at 461). He explained that she had tried ten or twelve separate pain medications without success, and again suggested psychosocial problems rather than migraines caused them. (*Id.*). Ultimately, Plaintiff tried to control her headaches by continuing to take a narcotic painkiller as needed. (R. at 462-63).

Plaintiff saw neurologist Dr. Angela Benavides in the spring of 2010. (R. at 581-83). Plaintiff complained of difficult-to-control seizures and said she was taking 1,000 mg of Carbamazepine each day. At the time of her consultation with Dr. Benavides, Plaintiff said she last had a seizure eight months ago when she was helping her mother move. (R. at 581). Plaintiff also continued to complain about headaches, which she had multiple times each week. She said that the headaches can persist for two to three days at a time, and mentioned that only narcotics provided relief. (*Id.*). Dr. Benavides prescribed a variety of medications meant to control hear headaches and also instructed Plaintiff to begin physical therapy. (*Id.*).

Her notes reflect that Plaintiff had seizures in September and November of 2010. (R. at 585-86). Dr. Benavides described Plaintiff's seizures as "spells," rather than generalized seizures, and instructed her not to drive. (R. at 616). In November of 2011, Plaintiff reported two seizures – one before Easter 2011, and the other later. (R. at 622). Her level of her anti-seizure drug was subtherapeutic at the visit, which Dr. Benavides suggested "could possibly be due to non compliance." (*Id.*).

Finally, Plaintiff also saw Dr. Dale Chilson about her headaches in March of 2011. (R. at 588-89). She came in complaining of "sinus problems," and explained that she has a history of migraine headaches. (R. at 588).Dr. Chilson suggested that her headaches could be caused by barosinusitis. (R. at 589).

A number of consulting physicians also opined on Plaintiff's condition. Dr. Philip Budzenski provided the Illinois Disability Determination Division with a report in April of 2008. (R. at 543-47). In it, he suggested that she may have headaches because of neck pain, and acknowledged her seizures but explained that she had not had any other ones since she began taking carbamazepine. (R. at 547).

Also in April of 2008, Dr. Mark Langgut conducted a psychological assessment. (R. at 536-39). At the time of the assessment, Plaintiff has recently stopped working. (R. at 536). Although Dr. Langgut found Plaintiff to be cooperative and friendly, he observed that she "presented as clearly very frustrated. . ." and had obvious symptoms, including memory problems and "muscle tremors in her hands and arms." (*Id.*). She complained of seizures that she could not control, and recurring migraines, and felt "upset and severely depressed and hopeless" by her job loss, lack of medical insurance, and costly bills. (R. at 537, 538).

7

Plaintiff told Dr. Langgut that she knows how to complete all daily activities, but pain and migraines limit her functionality. (R. at 537). Plaintiff claimed she had "global memory deficits," saying she does not integrate information efficiently and forgets information like movies and dates. (R. at 538). Tests, however, indicated she had intact immediate recall ability, short term memory functioning, and long term memory functioning. Even so, she subtracted continuous threes in a "slow, mechanical way," that suggested that she has slow computational skills. (*Id.*). He diagnosed her with dysthymic disorder, anxiety disorder, and migraine headaches. (R. at 539).

Nearly four years later, Dr. Mark Amdur reviewed Plaintiff's file. He found insufficient evidence in the record to diagnose and rate the severity of any psychiatric or neuro-psychiatric disorder (R. at 592), and believed that past providers and consulting physicians had failed "to adequately consider [Plaintiff's] persistent complaints of memory impairment, 'periods of confusion,' . . . [and] difficulty with concentration." (*Id.*). Moreover, he opined that there was no evidence of cognitive testing that is powerful enough to justify the conclusion that Plaintiff can complete employment tasks, as all testing done by Dr. Langgut and Plaintiff's treating neurologists was "totally inadequate to detect the subtle, but possibly significant cognitive impairments" that Plaintiff could have. (R. at 592-93).

Finally, Dr. Joshua Warach conducted a neurological consultative examination of Plaintiff in April 2012. (R. at 601-02). He found that the neurological examination was "significant for memory difficulty, disorientation to date and otherwise non-focal," and that she had chronic memory difficulty. (R. at 601). He

noted that the examination did "identify memory and cognitive difficulty," and explained that he was "concerned that psychogenic factors may be contributory to her symptoms." (R. at 602).

## II. Hearing Testimony

The most recent hearing before an ALJ took place on August 27, 2012, and featured testimony from Plaintiff, her husband, and a Vocational Expert. (R. at 43-88).

During the hearing, Plaintiff described the ways her seizures and headaches have affected her. She testified that she has gone up to a year without having a seizure, but that she tends to have them every four to six months. (R. at 54). She had most recently had a seizure two months before the hearing. (R. at 52). Although her recent seizures had occurred at night, she said she used to have them during the day while she was active. (*Id.*). She believes stress is a major cause of her seizures: she said she got them from going up and down stairs, raking in her yard, and pulling weeds. (R. at 56).

She said that she has been told that during her seizures she loses consciousness, she stops breathing, and her body becomes rigid. (R. at 52). Following them, she feels disoriented, with sore joints and an increased heart and breathing rate. (*Id.*). Her joints stay sore for weeks after seizures. (*Id.*). Said she has medication that causes drowsiness and upsets her stomach. (R. at 53).

Plaintiff's husband also testified at the hearing about her seizures. He confirmed that she last had a seizure two months before the hearing, and had previously had one two months before that (around Easter of 2012). (R. at 70-71).

He said that when she has seizures during the night, he's awakened because the bed shakes. (R. at 72). He described her seizures, saying that she turns around clockwise for two to three rotations with her head to the right, and then gets rigid, shakes, and falls to the ground. (R. at 74).

Plaintiff said she suffers from migraines nearly every day. (R. at 55). Likewise, her husband estimated she has twenty-eight migraines in a thirty-day month. (R. at 73). Plaintiff said she feels her headaches behind her right eye and in the back of her skull. (R. at 55). The headaches make her nauseous, and she is bothered by light and sound. (*Id.*). She said the headaches are triggered by changes in barometric pressure (often she gets headaches before a change in the weather that can incapacitate her for days), as well as stress and smells (like food). (R. at 64-68). She cannot get rid of them unless she goes to sleep. (R. at 55).

Plaintiff testified that her seizures and headaches have affected her daily activities in profound ways. In a typical day, she wakes up at 4 a.m. with an upset stomach (which she believes is caused by her medication) and feeds her animals. (R. at 58). She then lays down until 6 a.m., when her husband goes to work. (*Id.*). She takes her medication at 9 a.m., and then takes a morning nap once the medication kicks in. (*Id.*). Her effectiveness in the afternoon depends on how she feels. She takes more medication at 8 p.m., after her stomach has settled from dinner, and is in bed again by 10 or 11 p.m. (*Id.*).

Plaintiff said she is able to do some chores. She cooks, cleans, pays bills, feeds her pets, and (with her husband's help) does laundry. (R. at 58-59). Although she cooks, she said she needs to cook simpler meals that have little odor so she can

10

avoid having an odor-induced headache. (R. at 67-68). She no longer does yard work or mows the lawn, (R. at 60), avoids extreme heat, and does not exercise. (R. at 60-61). She also stopped driving after she had her second seizure. (R. at 61).

Plaintiff said that as a result of her headaches and seizures, she often feels depressed and anxious, (R. at 56-57), and she also complained that she regularly forgets things she once remembered, like the current day of the week. (R. at 69). Plaintiff's husband testified that her memory loss manifests itself when she doesn't remember when to take her medicine, or if she has even taken it. (R. at 72).

Finally, a Vocational Expert testified at Plaintiff's hearing. The ALJ first posed a hypothetical in which an individual of a similar age, work experience, and education as Plaintiff was limited to light work with no climbing, ladders, ropes or scaffolding; no exposure to heights or dangerous, moving machinery; no driving; and only required following simple instructions, routine tasks, and simple work-related decision making. (R. at 77-78). The Vocational Expert concluded that such an individual would not be able to do any of Plaintiff's past work, but could do a number of other jobs such as "hand packer." (R. at 78). Similar opportunities existed if such a hypothetical person was restricted to sedentary work. (R. at 78-79). However, the Vocational Expert testified that no jobs would be available if a person needed to miss three days of work per month because of headaches or seizures, miss twenty-one days a year (at unexpected times), or was off-task thirty-percent of the time because of memory problems, pain, or side effects of medication. (R. at 79-80).

### III.    The ALJ's Decision

The ALJ found that Plaintiff had a number of severe impairments, including seizure disorder, migraine headaches, depression, and anxiety. (R. at 26). She concluded that none of the impairments or combination of impairments met or medically equaled the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 27).   Then, the ALJ concluded that Plaintiff has the residual functional capacity to perform light work, with a number of modifications, including never climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; occasionally balancing, stooping, kneeling, crouching, and crawling; never being exposed to heights or hazards like dangerous, moving machinery; never driving as part of her job duties; and being limited to simple instructions, routine tasks, and simple, work-related decisions. (R. at 28). Although she concluded Plaintiff was unable to do past work, (R. at 34),  the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 35-36).

In determining Plaintiff's RFC, the ALJ did not give much weight to the opinion of Dr. O'Shaughnessy. (R. at 34). The ALJ also discounted Plaintiff's credibility. (R. at 33).

#### LEGAL STANDARDS

### I.  Disability Standard

To be entitled to disability benefits under the Social Security Act, a claimant must prove he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C.

§ 423(d)(1)(A). The Commissioner must make factual determinations in assessing the claimant's ability to engage in substantial gainful activity. *See* 42 U.S.C. § 405(b)(1). The Commissioner applies a five-step sequential analysis to determine whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999). The claimant has the burden to prove disability through step four of the analysis, i.e., he must demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).

In the first step, a threshold determination is made as to whether the claimant is presently involved in a substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not under such employment, the Commissioner of Social Security proceeds to the next step. *Id.* At the second step, the Commissioner evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has an impairment that significantly limits his physical or mental ability to do basic work activities, the Commissioner will proceed to the next step. 20 C.F.R. § 404.1520(c). If the claimant's impairments, considered in combination, are not severe, he is not disabled and the inquiry ends. *Id.* At the third step, the Commissioner compares the claimant's impairments to a list of impairments considered severe enough to preclude any gainful work; if the elements of one of the Listings are met or equaled, the claimant is eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpt. P, App. 1.

If the claimant does not qualify under one of the listed impairments, the Commissioner proceeds to the fourth and fifth steps, after making a finding as to

the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). At the fourth step, the claimant's RFC is evaluated to determine whether he can pursue his past work. 20 C.F.R. § 404.1520(a)(4)(iv). If he cannot, then, at step five, the Commissioner evaluates the claimant's ability to perform other work available in the economy, again using his RFC. 20 C.F.R. § 404.1520(a)(4)(v).

## II. Standard of Review

When a claimant seeks judicial review of an ALJ's decision to deny benefits, the Court must "determine whether it was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The Court's review is governed by 42 U.S.C. § 405(g), which provides, in relevant part: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Maggard*, 167 F.3d at 379 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

In a substantial evidence determination, the Court will review the entire administrative record, but it will "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). In particular, credibility determinations by the ALJ are not upset "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). The Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to his conclusion," but he need not have addressed

every piece of evidence. *Clifford*, 227 F.3d at 872. Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

DISCUSSION

Plaintiff has identified three major grounds on which she is challenging the ALJ's decision. As discussed below, the Court concludes that this matter must be remanded because the ALJ erred in assessing the opinion of Plaintiff's treating physician and also erred in assessing Plaintiff's credibility.

## I. The ALJ Erred in Her Handling of Dr. O'Shaughnessy's Opinion

Plaintiff's first argument is that the ALJ erred by refusing to give controlling weight to Dr. O'Shaughnessy's opinions. As explained below, the ALJ was not required to give Dr. O'Shaughnessy's opinions, as articulated, controlling weight. However, the ALJ did not fulfill her obligation to develop the record with respect to Dr. O'Shaughnessy's opinions and also provided insufficient reasons for disregarding what she imagined were the doctor's opinions. Therefore, remand is necessary.

Dr. O'Shaughnessy wrote a number of letters on Plaintiff's behalf over the course of her treatment with him, two of which are relevant here. The first was written on July 8, 2008, and states that he again saw Plaintiff "for persistent headaches and also likely partial complex seizures with secondary generalization." (R. at 19). He noted that, despite treating both with drugs, Plaintiff had a breakout seizure and continued to have "significant headaches." (*Id.*). He opined that the headaches and seizures "do not allow her to work for any significant length of time,"

15

and said she was "unable to work" because of "the combination of her headaches and her seizure disorder." (*Id.*). Five weeks later, Dr. O'Shaughnessy wrote that although Plaintiff has not been able to work because of her neurological condition, "[t]he prognosis for her to work in the future is actually good." (R. at 20).

Plaintiff was represented by an attorney during the administrative proceedings, and the attorney submitted a pre-hearing brief that made reference to these letters. (*See* R. at 34, 453). However, Plaintiff did not submit these letters for the record, and the ALJ did not have copies of them to consider in rendering her decision. (*See* R. at 34). The ALJ closed the record for submission of additional evidence at the hearing, after Plaintiff's attorney indicated that he had no objections to the record as it stood at that time and did not have any outstanding evidence to submit.  (R. at 45-46).

The ALJ quickly dismissed Dr. O'Shaughnessy's opinion, writing that she did not "afford controlling weight or even great weight to it." (R. at 34). She noted first that she could not find the opinions in the record, and then decided that such letters, "assuming they exist," deserve little weight. (*Id.*).  She provided seven reasons for affording the opinion little weight. First, Dr. O'Shaughnessy's opinion that Plaintiff cannot work is one that is reserved for the Commissioner. (*Id.*). Second, he did not provide a function-by-function assessment of Plaintiff's limitations. (*Id.*). Third, Plaintiff did not receive treatment for a year, between August 2008 and 2009. (*Id.*). Fourth, Plaintiff had lengthy periods of time (June 2008 through July 2009 and July 2009 through November 2010) in which she was seizure free. (*Id.*). Fifth, Plaintiff engaged in a number of activities such as helping

16

her mother and friends move, and mowing the lawn. (*Id.*). Sixth, she had normal neurological exams. (*Id.*). And seventh, there was no evidence that she sought more aggressive treatment for her headaches or canceled appointments because of them. (*Id.*).

Now, Plaintiff argues that the ALJ failed in her duty to fully develop a record, and should have given Dr. O'Shaughnessy's opinion controlling weight after obtaining copies of the letters. The Commissioner argues that the Court should not consider the letters because they were not part of the record before the ALJ.

## A. The ALJ's Obligation to Develop the Record

ALJs in Social Security hearings have a duty to develop a full and fair record. *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). An ALJ's failure to fully develop a record is good cause for remanding a case. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). However, an ALJ must make a "significant omission" in order to justify remand. *Nelms*, 553 F.3d at 1098. The duty to develop the record is particularly heightened when a claimant is unrepresented by counsel. *Id.* In such a case, the ALJ "must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," and "supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Id.* (internal quotation marks omitted). When a plaintiff is represented by counsel, however, they are presumed to have made their best case before the ALJ. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

The ALJ failed to develop the record in two separate ways. First, she speculated as to the content of Dr. O'Shaughnessy's opinion after acknowledging that it was not a part of the record. Specifically, she provided the letters with little weight under the assumption that they existed. (R. at 34). She then proceeded to provide reasons for discounting the opinion, having not even read the letters. (*See id.*). An ALJ's decision must be based on evidence, and this speculation cannot substitute for the actual content of the letters.

Second, the ALJ anticipated that the opinion inappropriately opined on an issue reserved for the Commissioner and was incomplete, yet she took no affirmative steps to contact Dr. O'Shaughnessy. The ALJ's primary reason for discounting the letters is that they opined on issues reserved to the Commissioner. (*Id.*). This initial reaction is only partially correct. Opinions that are dispositive of a case, including opinions that a claimant is "disabled" or "unable to work" are not medical opinions. 20 C.F.R. § 404.1527(d)(1). Even when offered by a treating physician, no special significance attaches to an opinion on issues reserved for the Commissioner. *Id.* at § 404.1527(d)(3).[2]

---

[2] Plaintiff argues that Dr. O'Shaughnessy's opinion should be entitled to controlling weight because he is her treating physician, his opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and the opinion is not inconsistent with other medical evidence on file. (Doc. 16 at 10). Plaintiff further argues that the ALJ is required to consider a variety of regulatory factors in evaluating medical opinions offered by treating sources, and erred by failing to do so with regard to Dr. O'Shaughnessy's opinion. (*Id.*). The regulations only require that ALJs go through such an analysis with respect to *medical* opinions offered by treating physicians. *See* 20 C.F.R. § 404.1527(c). Although ALJs have certain obligations to develop non-medical opinions issued by treating physicians, a treating physician's non-medical opinion is not evaluated in the same way as a medical opinion.

However, it is not always appropriate for an ALJ to discount a treating physician's opinion on these issues without first attempting to supplement the record. ALJs "must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." SSR 96-5p, 1996 WL 374183, at *2 (1996). An ALJ must "make every reasonable effort to recontact [treating] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear . . . ." *Id.* This includes times when medical sources opine that their patient is "disabled" or "unable to work." *Id.* at *5. If an ALJ fails to make an effort to recontact a physician who provided an unclear or overbroad opinion on a matter reserved for the Commissioner, she commits reversible error. *See Giebudowski v. Colvin*, 981 F. Supp. 2d 765, 776 (N.D. Ill. 2013); *Selby v. Barnhart*, 48 F. App'x. 576, 581 (7th Cir. 2002).

In this case, the ALJ discounted Dr. O'Shaughnessy's opinion in part because it did not include a function-by-function assessment of Plaintiff's abilities. (R. at 34). First, it is worth noting that governing regulations do not require a treating physician to submit a function-by-function assessment of a patient as part of his opinion, and dismissing a treating physician's opinion for that reason is inappropriate. *See Nash v. Colvin*, No. 12 C 6225, 2013 WL 5753796, at *12 (N.D. Ill. Oct. 23, 2013); *Peterson v. Colvin*, No. 13 C 3133, 2014 WL 4652475, at *11 (N.D. Ill. Sept. 18, 2014); *see also Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) (holding that ALJs are not required to conduct a function-by-function assessment in determining a claimant's residual functional capacity). Second, the ALJ identified

what she believed to be a shortcoming in Dr. O'Shaughnessy's opinion that rendered it unclear or incomplete: the lack of a function-by-function assessment. (R. at 34). In such a case, the ALJ has an obligation to recontact the physician and further develop the record. *See Giebudowski*, 981 F. Supp. 2d at 776; SSR 96-5P, 1996 WL 374183, at *2.

These failures on the part of the ALJ to develop the record are sufficient to warrant remand in spite of the presumption that the record was complete. *See Skinner*, 478 F.3d at 842. There are, of course, times in which a represented claimant cannot succeed on a claim that the ALJ failed to develop the record. A claimant, through counsel, cannot "rest on the record – indeed, [] exhort the ALJ that the case is ready for decision – and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008). So, for example, in *McFadden v. Astrue*, 465 F. App'x 557 (7th Cir. 2012), a claimant whose attorney failed to introduce into the record letters submitted by the claimants' friends and family could not argue that the ALJ failed to adequately develop the record because the attorney "explicitly told the ALJ that the record was complete even after the ALJ remarked that only two pieces of third-party correspondence were in the record." *Id.* at 560. And in *Maes*, the court held that the ALJ did not fail to adequately develop a record that did not include medical records because the records were "not obvious from the administrative record or otherwise brought to the attention of the ALJ" and the claimant's attorney certified that the record was complete. 522 F.3d at 1097.

The situation is different here, where it appears that Plaintiff's attorney made an easily correctable oversight of which the ALJ was well-aware. Unlike in *Maes*, Plaintiff's counsel explicitly brought the letters written by Dr. O'Shaughnessy to the attention of the ALJ in the brief he submitted before the hearing, and the ALJ was aware of the significance of the omitted records. *See id.*; (R. at 34, 453). Although Plaintiff's attorney affirmatively indicated that the record was complete, *see Maes*, 522 F.3d at 1097, he did not do so after receiving warning from the ALJ that there were no treating physician opinions on file. *See McFadden*, 465 F. App'x at 560. These facts overcome the presumption of a fully-developed record.

In light of the Court's conclusion that the ALJ should have developed the record further, Defendant's argument that the Court should not consider the letters misses the mark. Defendant argues that the letters are unreviewable because they were not part of the administrative record that was before the ALJ and were later deemed new, material, and time-relevant by the Appeals Council. This is beside the point, as the letters *should have been* part of the record before the ALJ. The fact that they were not is sufficient to justify remand.

### B. The ALJ's Flawed Reasons for Discounting Dr. O'Shaughnessy's Opinion

Beyond the ALJ's failure to appropriately develop the record, the Court must note that a number of other reasons the ALJ gave for discounting what she believed to be Dr. O'Shaughnessy's opinion are erroneous. The ALJ should reconsider them on remand, when she must "evaluate all the evidence in the case record," including corroborated or uncorroborated findings of other treating and consulting medical

providers, "to determine the extent to which the opinion is supported by the record." *See* SSR 96-5P, 1996 WL 374183, at *3.

First, as discussed above, the fact that Dr. O'Shaughnessy did not provide a function-by-function assessment of Plaintiff's abilities is not, in itself, a good reason for discounting his opinion. (*See supra* at 19-20).

Second, the ALJ identified a gap in Plaintiff's treatment from August 2008 to June 2009 as reason for discounting the opinion. Yet, Dr. O'Shaughnessy rendered the opinion on which Plaintiff is relying in July of 2008, before this gap in treatment. Further, the ALJ failed to "explore[] [Plaintiff's] explanations as to the lack of medical care" during this time period, which ALJs must do when discounting evidence on the basis of infrequent treatment. *See Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (internal quotation marks omitted).  In fact, the record is replete with references to Plaintiff's financial hardships and lack of insurance, a factor that the ALJ does not mention in discrediting the opinion on the basis of infrequent treatment. (*See, e.g.,* R. at 524). Without exploration of reasons for Plaintiff not seeking treatment during this time period, her lack of treatment cannot supply a reason for discrediting the opinion. *See Moss*, 555 F.3d at 562.

Third, the ALJ identified a number of Plaintiff's activities that she believed were inconsistent with Dr. O'Shaughnessy's opinion that Plaintiff cannot work. These include things like helping her mother move, helping friends move, and mowing the lawn. The fact that Plaintiff occasionally engaged in certain activities is not inconsistent with Dr. O'Shaughnessy's conclusion. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014). In

*Scrogham*, the Seventh Circuit held that when a claimant occasionally drives, mows the lawn, or does yard work, such "sporadic performance of household tasks or work" cannot establish that a person is "capable of performing full-time work," especially when "at least one of the activities was a precipitating event that led to one of [the Plaintiff's] doctor's visits." *Id.* (internal quotation marks omitted). As in *Scrogham*, the record shows that Plaintiff only rarely engaged in the activities that the ALJ identified. *See id.* Moreover, she testified without contradiction that a number of them, including doing yard work (R. at 571), and helping her mother and a friend move (R. at 581), ended with her having seizures. Under these circumstances, Plaintiffs' reports of activities do not contradict Dr. O'Shaughnessy's opinion or show that Plaintiff is able to work. *See Scrogham*, 765 F.3d at 700.

Finally, the ALJ cited the absence of evidence that Plaintiff canceled appointments and her failure to seek more aggressive treatment as evidence that her headaches must not be disabling. (R. at 34). Although a claimant can support her claim that her disability will cause frequent absenteeism by presenting evidence of missed appointments, *see Punzio v. Astrue*, 630 F.3d 704, 711 (7th Cir. 2011), a claimant's regular attendance at medical appointments says very little about her ability to work during her appointments. Indeed, it would seem that a person suffering from debilitating headaches would have a strong interest in attending appointments and seeking relief rather than missing appointments. The ALJ's observations regarding Plaintiff's lack of more aggressive treatment are also unpersuasive. In evaluating a claimant's course of treatment, "[t]he essential question is . . . a comparative one: we need ask not only what treatment the

claimant received, but what treatment *could* the claimant have received (but did not)?" *Reopelle v. Colvin*, No. 14-C-411, 2015 WL 729672, at *5 (E.D. Wis. Feb. 19, 2015). Such comparisons are useful because a failure to seek aggressive treatment can suggest that a claimant's problem is not as severe as they say. *Id.* When a more aggressive option is not available, however, the fact that a particular claimant's treatment seems "conservative" is "largely irrelevant." *Id.* Here, the ALJ did not suggest alternative treatments that could serve as that necessary point of comparison. *See id.* And, in fact, the record includes Dr. Garg's notes that Plaintiff had exhausted her treatment options after trying a great number without success. (R. at 461). Therefore, Plaintiff's failure to seek more aggressive treatment and the fact that she did not miss appointments are not good reasons for undermining Dr. O'Shaughnessy's opinion.

As articulated by the ALJ, these multiple reasons for discounting Dr. O'Shaughnessy's opinion either cannot find support in the record or in logic. On remand, the ALJ should reconsider the weight that Dr. O'Shaughnessy's opinion deserves in light of the further-developed record and these issues.

## II. The ALJ Erred in Assessing Plaintiff's Credibility

The ALJ also erred in assessing Plaintiff's credibility. She provided a number of reasons for finding that Plaintiff's allegations are not fully credible. (*See* R. at 33). First, the ALJ first reasoned that Plaintiff's complaints of hand tremors and memory loss did not find any support in the medical records. (*Id.*). The ALJ then credited Dr. Garg's conclusion that he could not find any basis for Plaintiff's complaints. (*Id.*). Second, the ALJ identified a number of Plaintiff's activities that

24

she believed were inconsistent with complaints of frequent headaches and seizures. (*Id.*). These include mowing the lawn, doing yard work, going out for the evening, going to the post office, and helping her mother and friends move. (*Id.*). Third, the ALJ discounted Plaintiff's credibility Plaintiff worked for many years in spite of her headaches. (*Id.*). The ALJ also discounted Plaintiff's complaints regarding her headaches because of the conservative treatment she received, her failure to seek more aggressive or regular treatment, her failure to follow up with physical therapy, her lack of canceled appointments, and the fact that she is "always described as alert, oriented, and pleasant." (*Id.*). Finally, the ALJ noted that Plaintiff's decision to use a push mower to mow the lawn detracted from her credibility because it is unlikely that somebody who is worried about seizures would operate a push mower. (*Id.*).

Generally, courts "will not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). However, "an ALJ still must competently explain an adverse-credibility finding with specific reasons supported by the record." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015)(internal quotation marks omitted). "To evaluate credibility, an ALJ must 'consider the entire case record and give specific reasons for the weight given to the individual's statements.' SSR 96–7p. In other words, the ALJ should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication

taken, and 'functional limitations.'" *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

A number of the ALJ's reasons for discrediting Plaintiff are not supported by the record, ignore contrary evidence, or are based on impermissible assumptions. Because the ALJ did not indicate whether her decision depended upon her credibility finding, this provides another reason for remand. *See Engstrand*, 788 F.3d at 660.

First, the ALJ's assertion that Plaintiff's claims of hand tremors or memory loss find no support in the medical record is incorrect, and cannot serve as a basis for finding her incredible. Although the ALJ is correct that certain of Plaintiff's examining physicians did not observe hand tremors or find that she suffered from memory loss, there is not an absence of evidence of either. For example, Dr. Langgut found that Plaintiff presented to him with obvious symptoms, including both memory problems and muscle tremors in her hands and arms. (R. at 536). Although Dr. Langgut's testing did not indicate problems with her immediate recall ability, short term memory functioning, and long term memory functioning, (R. at 538), Dr. Amdur (to whom the ALJ afforded some weight (R. at 340)) concluded that that testing was "totally inadequate." (R. at 592-93). Moreover, Dr. Warach found Plaintiff had chronic memory difficulty. (R. at 601). Although there may only be limited support for both hand tremors and memory loss in the record, the ALJ's credibility determination depended upon her belief that there was an absolute lack of support for those ailments. That is simply untrue.

Second, as discussed above, the ALJ's insistence that Plaintiff's activities of daily living detract from her credibility is improper. The ALJ "failed to understand that working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." *Engstrand*, 788 F.3d at 661; *see also Scrogham*, 765 F.3d at 700. Unlike household tasks, a full-time job does not provide employees with "the flexibility to work around periods of incapacitation." *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014). When a claimant has good days and bad days and can concentrate their activities on their good days, the fact that she occasionally engages in certain activities that she could not engage in on her bad days is not a reason to discount her credibility. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Plaintiff's activities are hardly of the type that show she can consistently engage in work for a full work-week, and the activities that the ALJ cites for support are activities that Plaintiff associated with health difficulties. For example, the ALJ cited one of Dr. O'Shaughnessy's notes stating that Plaintiff can mow the lawn. (R. at 33; 571). In that same note, however, Dr. O'Shaughnessy also said Plaintiff was having headaches twice a week that require her to lie down and sleep. (R. at 571). It is entirely consistent that Plaintiff could occasionally mow the lawn while being unable to work a full week. *See Bjornson*, 671 F.3d at 647. The ALJ also cited Dr. O'Shaughnessy's note that Plaintiff did yard work. (R. at 33, 571). Yet Plaintiff had "an apparent seizure" following that work. (R. at 571). Dr. Benavides's notes show that Plaintiff went out for the night (R. at 586), an activity that the ALJ relied upon to find Plaintiff incredible. (R. at 33). Yet Plaintiff suffered a small

seizure that evening. (R. at 586). Dr. Benavides also reported that Plaintiff went to the post office (R. at 622), another activity that the ALJ relied upon in discrediting Plaintiff. (R. at 33). That too was associated with a seizure, for which there were witnesses. (R. at 622). Finally the ALJ pointed to Plaintiff helping her mother and friends move (R. at 33), but Plaintiff associated each with having seizures. (*See* R. at 581, 618).

These activities are not only seemingly irregular and therefore not well-suited to gauge whether Plaintiff can work regular hours. *See Bjornson*, 671 F.3d at 647. They are also activities that are consistent with Plaintiff's claims that (1) exertion and stress can cause her to suffer seizures, and (2) severe headaches limit her productivity during the week. *See Engstrand*, 788 F.3d at 661; *Scrogham*, 765 F.3d at 700. For these reasons, the ALJ erred by relying upon them to discount Plaintiff's credibility.

The ALJ also erred by relying upon the fact that Plaintiff has a long history of headaches, and previously worked in spite of them. When Plaintiff began seeing Dr. O'Shaughnessy for headaches in February of 2006, she told him that she had always had headaches but that they had recently become worse. (R. at 526). The timing of Plaintiff's complaint that her headaches had worsened corresponded with her first visit with Dr. O'Shaughnessy and also with the start of her FMLA leave from her job. (*See id.*). In discrediting Plaintiff's complaints of headaches, the ALJ failed to consider the possibility that her headaches had worsened, but rather seemed to assume that the headaches she suffered while she worked and the headaches she suffered after she stopped working were equivalent. This failure is

an error. *See Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014)(holding that the fact that claimant worked following onset of disability is an unsound reason for discrediting the claimant in light of claimant's worsening condition); *Engstrand*, 788 F.3d at 661 (holding that ALJ erred in credibility determination by relying upon outdated reports of activities of daily living and failing to consider whether claimant's pain had worsened over time). Moreover, the Seventh Circuit has explained that "even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Goins*, 764 F.3d at 679 (quoting *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012)). In this case, Plaintiff is not claiming that she was disabled when she was working prior to February of 2006; rather, she has claimed that her headaches worsened, which along with her emerging seizures contributed to her becoming disabled. Even so, the fact that she previously worked while having headaches – without further explanation – cannot serve as a reason to discount Plaintiff's credibility. *See Goins*, 764 F.3d at 679.

Finally, as described above, the fact that Plaintiff did not pursue more aggressive treatment, and the fact that Plaintiff did not miss any of her appointments are inappropriate reasons for discounting her credibility. (*See supra* at 23-24).

In light of these improper or poorly-explained reasons for discounting Plaintiff's credibility, the Court cannot conclude that the ALJ's credibility determination was not patently wrong. The ALJ did not explain in her opinion the relative weight she assigned to each of the reasons that contributed to her decision

to find the Plaintiff not credible. In spite of any reasons that the ALJ gave for discounting Plaintiff's credibility which are supported by the record, the Court cannot simply assume the ALJ would have reached the same conclusion regarding Plaintiff's credibility had she not made the errors discussed above. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)) (requiring that the ALJ "sufficiently articulate [her] assessment of the evidence to 'assure us that [she] considered the important evidence . . . and to enable us to trace the path of [her] reasoning.'"). On remand, the ALJ must revisit the issue of Plaintiff's credibility.

### III.    The Vocational Expert's Testimony

This leaves one final argument raised by Plaintiff. Plaintiff argues that the ALJ erred by failing to discuss in her opinion each of the hypotheticals that she provided to the Vocational Expert during the hearing. In response to a hypothetical, the Vocational Expert testified that no jobs would be available if the hypothetical individual needed to miss three days of work a month, or twenty-one days a year at unpredictable times, or would be off-task thirty-percent of the workday. (R. at 78-79). The ALJ did not discuss any of these scenarios in her decision.

Plaintiff argues that the ALJ was obligated to address these hypotheticals in her decision because the ALJ requested that the Vocational Expert express an opinion on them. She supports this proposition by citing to three cases: *Reese v. Colvin*, 2014 WL 1319364, at *12 (N.D. Ind. Mar. 27, 2014); *Olson v. Astrue*, No. 08 C 0996, 2009 WL 2365511, at *13 (N.D. Ill. Mar. 16, 2009); and *Baily v. Barnhart*, 473 F. Supp. 2d 822, 840 (N.D. Ill. 2006).

None of these cases stand for the proposition that an ALJ errs when she solicits testimony from the Vocational Expert and then fails to expressly address those hypotheticals in her opinion. Rather, in each of these cases, the Vocational Expert opinioned on an issue that would preclude work, and the ALJ mishandled that dispositive issue when determining the claimant's residual functional capacity. For example, in *Reese v. Colvin*, the Court held that the ALJ erred because the residual functional capacity that he determined appeared to be based on the characteristics that the Vocational Expert suggested would allow work rather than on the claimant's abilities as reflected in the medical records. *See* 2014 WL 1319364 at *11-12. Had the ALJ based the residual functional capacity on evidence in the record, there would have been no reason for him to address each and every one of the hypotheticals he provided to the Vocational Expert. *See id.* Likewise, in *Olson v. Astrue*, the ALJ failed to include any limitations on the claimant's concentration, persistence or pace in the RFC in spite of unaddressed medical evidence that the claimant had moderate limitations. 2009 WL 2365511 at *12. When the Vocational Expert testified that a person with moderate (or mild) limitations in concentration, persistence or pace who was off-task for between five and ten minutes in an hour would be unable to work, and the ALJ failed to determine how much time per hour the Plaintiff would be off-task as part of the residual functional capacity, the ALJ erred. *See id.* at *12-13.  And finally, in *Bailey v. Barnhart*, the ALJ failed to address the claimant's "noted inability to concentrate and adhere to a schedule" as part of the residual functional capacity, even though the Vocational Expert said such inability would preclude work. 473 F. Supp. 2d at 839-40.

As explained above, the ALJ failed to adequately develop the record with respect to Dr. O'Shaughnessy and inappropriately assessed Plaintiff's credibility. Had the ALJ properly developed the record, assessed Dr. O'Shaughnessy's opinion, and assessed Plaintiff's credibility, it is possible that she would have articulated a more limiting residual functional capacity than she did. In such a case, certain of the hypotheticals she posed to the vocational expert might come into play. For example, if the ALJ found Plaintiff's complaints of regular debilitating headaches to be credible, then there would have been evidence that Plaintiff would routinely miss work that the ALJ would need to take into account as part of the residual functional capacity. However, it is these earlier failures, and not the ALJ's failure to address each pro-Plaintiff hypothetical posed to the vocational expert, that necessitate remand. *See Halsell v. Astrue*, 357 F. App'x 717, 724 (7th Cir. 2009) ("[Plaintiff's] real problem is not with the hypothetical questions posed to the VE but with the ALJ's decision to discredit her testimony.").

## CONCLUSION

Because the ALJ failed to develop the record with respect to Dr. O'Shaughnessy's opinion and failed also to properly assess Plaintiff's credibility, the decision must be remanded to the Social Security Administration for further proceedings.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc.  15) is GRANTED IN PART and DENIED IN PART and that Defendant's Motion for Summary Affirmance (Doc. 18) is DENIED. The Court VACATES the decision denying benefits and REMANDS this matter back to the

Commissioner for further proceedings pursuant to 42 U.S.C. § 405(g)(sentence four).

IT IS SO ORDERED. CASE TERMINATED.


Entered this 21st day of September, 2015.


                                       s/Joe B. McDade
                                     JOE BILLY McDADE
                          United States Senior District Judge